**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| M.S., an individual, | Case No. 24-cv-4011 |
| Plaintiff, | |
| v. | JUDGE _____ |
| G6 HOSPITALITY, LLC; G6 HOSPITALITY FRANCHISING, LLC; CHOICE HOTELS INTERNATIONAL, INC., and WYNDHAM HOTEL & RESORTS, INC., | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

**COMPLAINT**

COMES NOW, the Plaintiff M.S. ("Plaintiff" or "M.S."), by and through her undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

**INTRODUCTION**

1. Plaintiff is a survivor of human sex trafficking.

2. M.S.'s life story reads like a tragedy wherein she was forced to endure violence, trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation.

3. M.S. met her first trafficker at the age of fifteen, after he kidnapped, drugged, and groomed her into human trafficking. She spent years with him moving from hotel to hotel, forced as a child, to have sex for money. M.S. met her second trafficker when she was older, groomed and forced to have sex for money yet a second time. Ultimately her trafficker came to control every aspect of her life. The defining factor of the relationship between M.S. and her trafficker, was that each night, M.S.'s trafficker forced her to have sex with men for money.

1

4.      M.S. was trafficked in hotels owned by Defendants[1] Choice Hotels International, Inc. ("Choice"), Wyndham Hotels & Resorts, Inc. ("Wyndham"), and G6 Hospitality, LLC & G6 Hospitality Franchising, LLC (together "G6"). M.S.'s trafficker rented hotel rooms for one purpose—a location to engage in sex trafficking.

5.      At Defendants' hotels, M.S. was forced to engage in sex with many men every day. Every new customer was another instance M.S. was forced to have sex against her will—that is to say, M.S. was raped multiple times per day by multiple men when she stayed at Defendants' hotels.

6.      M.S.'s trafficker forced her onto Defendants' property where she was repeatedly raped and forced to perform commercial sex acts with "buyers" under threats of physical and psychological abuse.

7.      At one point, M.S. was rescued by investigators of Human Trafficking, and was finally able to escape the grasps of her trafficker and the prison of Defendants' hotel rooms.

8.      M.S. has spent a considerable amount of time attempting to regain the life and the childhood that was stripped away from her as a result of her trafficking.

9.      M.S. brings this lawsuit in an attempt to hold Defendants accountable for their role in her trafficking.

## OVERVIEW OF TRAFFICKING

10.     For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. Traffickers paraded throughout hotels, while hospitality giants stood on the sidelines and did nothing. Instead, hotels and motels paid only lip service to campaigns against sex trafficking and stood by collecting millions in profits from their trafficking occurring on their

---

[1] Throughout this Complaint, when Plaintiff refers to "Defendants," that statement is alleged as to all Defendants named in this action, including Wyndham, Choice, and G6. In the instances when Plaintiff alleges a fact as to only one Defendant, or some number of Defendants less than the total, the Complaint clearly names the Defendant to which the allegation is made.

properties.

11.     The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[2] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

12.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[3]

13.     Defendants knew and have known for decades that they profit from sex trafficking repeatedly occurring under their brand flags. Rather than taking timely and effective measures to stop profiting from this epidemic, Defendants choose to ignore the open and obvious presence of sex trafficking on their branded properties, benefitting from the profit and fees created by rooms rented and Wi-Fi provided for this explicit and apparent purpose.

14.     The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[4] However, traffickers aren't the only profiteers. The hotel industry, including Defendants, makes millions from participating in ventures that they know or should have known engage in violations of 18 U.S.C.

---

[2] See, e.g., A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; Prostitution and Trafficking in Women: An Intimate Relationship, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women intimate-relationship.

[3] *Id.*

[4] *Profits and Poverty: The Economics of Forced Labor,* INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm.

§ 1591(a) through renting rooms where sex trafficking victims are harbored night after night and providing Wi-Fi that traffickers use to advertise and solicit victims for commercial sex acts. Defendants and traffickers have a mutually beneficial relationship, fueled by the sexual exploitation of victims.

15.     The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Defendants knew or should have known regarding the trafficking of M.S. at the Defendants Hotel.

16.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[5] This is no accident. For years, sex traffickers have been able to reap enormous profits with "little risk when attempting to operate within hotels."[6] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[7] Hotels have been found to account for over 90 percent of commercial exploitation of children.[8]

17.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.[9]

---

[5] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-traffickingusslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere."

[6] See Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[7] Michele Sarkisian, Adopting the Code: Human Trafficking and the Hospitality Industry, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wpcontent/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[8] Erika R. George & Scarlet R. Smith, In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[9] See, e.g., Department of Homeland Security, Blue Campaign Toolkit, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, Child Sex Trafficking Overview, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, Red Flags for Hotel and Motel Employees, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

18.     The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[10] From check-in to check-out, there are indicators that traffickers and their victims exhibit during their stay at the hotel.

19.     Defendants and other members of the hospitality industry are and have long been aware of the prevalence of human trafficking, particularly sex trafficking, at hotels in general and at the Defendants' own properties. Defendants and others in the industry have access to much public information on the prevalence of human trafficking at hotels, including reports by, among others, the Polaris Project created for the use of the hospitality industry.

20.     The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by Defendants and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to the very opposite: continuing with business as usual, so that Defendants and all industry participants continue to profit millions from participating in a venture in violation of § 1591(a).

21.     Defendants' decision to prioritize profits over protecting sex trafficking victims resulted in the repeated sexual exploitation and rape of M.S. on their properties.

22.     M.S. looks to the judicial system, who has been empowered by Congress to provide a remedy to Victim-Survivors pursuant to the Trafficking Victim Protection Reauthorization Act, 18 U.S.C. § 1595 and Child Abuse Victim's Rights Act, 18 U.S.C. § 2255. Each Defendant, knowingly benefitted from participation in a venture that it knew or should have known to be

---

[10] Department of Homeland Security, Blue Campaign Toolkit,
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

engaging in violations of 18 U.S.C. § 1591(a).

## PARTIES

23.     Plaintiff M.S. is a natural person and a resident and citizen of Banning, California.

24.     Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16).

    a. Due to the sensitive and intimate nature of the issues, Plaintiff M.S. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[11]

    b. Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[12] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[13] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense.[14]

    c. Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

    d. Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the

---

[11] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[12] Fed. R. Civ. P. 10(a).

[13] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[14] Fed. R. Civ. P. 26(c).

customary practice of judicial openness.[15]

    e.   Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

25.    **Defendant Choice Hotels International, Inc.** ("Choice") is one of the largest hotel franchisors in the world and offers its brand public lodging services through its affiliates, subsidiaries, and franchisees.  It is a Delaware corporation with its headquarters in Rockville, Indianapolis and can be served through its registered agent, United States Corporation Company, at 1160 Dublin Road, Suite 400, Columbus Ohio, 43215.

26.    Choice owned, supervised, managed, controlled, and/or operated the Rodeway Inn located at 6730 N Blackstone Ave, Fresno, CA 93710 ("Fresno Rodeway Inn").

    a.   The Fresno Rodeway Inn was a Choice brand property.[16]

    b.   Choice employees worked throughout the Fresno Rodeway Inn. Choice employees worked jobs including front desk and housekeeping. Choice was the principal who controlled over nearly every element of operations at the Fresno Rodeway Inn. Choice is liable, either directly, vicariously, or indirectly through an agency relationship for the acts and/or omissions of the employees at its branded hotels, including the Fresno Rodeway Inn where M.S. was trafficked. Choice had an actual and apparent agency relationship with the physical property owner of the Fresno Rodeway Inn as to establish vicarious liability.

    c.   Choice controlled and dictated the actions and inactions of the Fresno Rodeway Inn through highly specific and detailed brand standards, policies, and

---

[15] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

[16] *Our Brands*, CHOICE HOTELS, https://www.choicehotels.com/about/brands (last visited Jun. 9, 26 2022).

procedures.

d. Choice knowingly benefited, or received something of value, from its commercial business venture at the Fresno Rodeway Inn by royalty fees, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where M.S. was trafficked, as well as in maintaining a positive public image for the Choice brand. Choice also benefited from gathering personal data from the Wi-Fi it provided to customers including M.S. and her trafficker.

e. Choice is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, contracting to supply services in Ohio. Choice has derived substantial revenue from services rendered in Ohio.

f. Whenever reference is made in this Complaint to any act, deed, or conduct of Choice, the allegation is that Choice engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Choice.

27. **Defendant Wyndham Hotel & Resorts, Inc.** ("Wyndham") is a large hotel brand with nearly 9,000 branded properties worldwide. Wyndham is a Delaware corporation with its principal place of business in Parsippany, NJ.

28. Wyndham maintains a registered agent in Ohio, and it can be served through its registered agent, Corporate Creations Network, Inc., at 119 E. Court Street, Cincinnati, OH 45202.

29. Wyndham is the successor entity to Wyndham Worldwide Corporation and retains successor liability for the wrongful acts of its predecessor. Where applicable, references to Wyndham in this Complaint refer also to Wyndham Worldwide Corporation.

30. Wyndham owned, supervised, managed, controlled, and/or operated: Super 8 Fresno located at 1087 N Parkway Dr, Fresno, CA 93728 ("Super 8 Fresno").

a. Super 8 Fresno was a Wyndham brand property.[17]

b. Wyndham employees worked throughout the Super 8 Fresno brand property. Wyndham employees worked jobs including front desk and housekeeping. Wyndham is the principal with control over nearly every element of operations at the Super 8 Fresno brand property. Wyndham is liable, either directly, vicariously, or indirectly through an agency relationship for acts and/or omissions of the employees at its branded hotels, including the Super 8 Fresno where M.S. was trafficked. Wyndham has an actual and apparent agency relationship with the physical property owners of the Super 8 Fresno to establish vicarious liability.

c. Wyndham controlled and dictated the actions and inactions of the Super 8 Fresno Branded Properties through highly specific and detailed brand standards, policies, and procedures.

d. Wyndham knowingly benefited, or received something of value, from its ventures at the Super 8 Fresno Branded Properties through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where M.S. was trafficked, as well as in maintaining a positive public image for the Super 8 Fresno brand property. Wyndham also benefited from gathering personal data from the Wi-Fi it provided to customers including M.S. and her trafficker.

e. Wyndham is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, contracting to supply services in Ohio. Wyndham has derived substantial revenue from services rendered in Ohio.

f. Whenever reference is made in this Complaint to any act, deed, or conduct of Wyndham, the allegation is that Wyndham engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Wyndham.

---

[17] *Our Brands,* Wyndham Hotels, https://www.wyndhamhotels.com/wyndham-rewards/our-brands (last visited September 27, 2022).

31.    **Defendant G6 Hospitality, LLC** is one of the largest hotel franchisors in the world and offers its brand public lodging services through its affiliates, subsidiaries, and franchisees. The company also provides franchise opportunities for its hotel and motel brands through **G6 Hospitality Franchising, LLC (together "G6")**[18].

32.    G6 is a Delaware corporation with its headquarters in Carrollton, TX.

33.    G6 maintains a registered agent in Ohio, and it can be served through its registered agent, Cogency Global, Inc., 3958-D Brown Park Dr, Hilliard, OH 43026.

34.    Motel 6 by G6 is classified as a value brand hotel.[19]

35.    G6 owns, supervises, manages, controls, and/or operates the Motel 6 Fresno North Crystal Avenue located at 1240 N Crystal Ave, Fresno, CA 93728 ("Motel 6 Fresno").

a.    Motel 6 Fresno was a G6 brand property.

b.    G6 employees worked throughout the Motel 6 Fresno. G6 employees worked jobs including front desk and housekeeping. G6 is the principal with controlled over nearly every element of operations at the Motel 6 Fresno. G6 is liable, either directly, vicariously, or indirectly through an agency relationship for the acts and/or omissions of the employees at its branded hotels, including the Motel 6 Fresno where M.S. was trafficked. G6 had an actual and apparent agency relationship with the physical property owner of the Motel 6 Fresno as to establish vicarious liability.

c.    G6 controlled and dictated the actions and inactions of the Motel 6 Fresno through highly specific and detailed brand standards, policies, and procedures.

d.    G6 knowingly benefited, or received something of value, from its commercial business venture at the Motel 6 Fresno through royalty

---

18 Upon information and belief, G6 Hospitality, LLC in turn owns and controls G6 Hospitality Franchising, LLC through a series of wholly owned financing subsidiaries. Defendants G6 Hospitality, LLC and G6 Hospitality Franchising, LLC will be collectively referred to as "G6".

19 *Motel 6 – An Iconic American Brand,* G6 HOSPITALITY, https://g6hospitality.com/our-brands/

payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where M.S. was trafficked, as well as in maintaining a positive public image for the Motel 6 brand.

e.  G6 is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operations of numerous hotels in Ohio, contracting to supply services in Ohio. G6 has derived substantial revenue from services rendered in Ohio.

f.  Whenever reference is made in this Complaint to any act, deed, or conduct of G6, the allegation is that G6 engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of G6.

## JURISDICTION AND VENUE

36.  This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

37.  The Court has personal jurisdiction pursuant to the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA") and 18 U.S.C. § 2255, Child Abuse Victims' Rights Act ("CAVRA").

38.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because the Court has personal jurisdiction over Defendants Choice, Wyndham, and G6.

## FACTUAL BACKGROUND

### INTRODUCTION

39.  M.S. brings her claims against major hotel brand corporations for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595(a) and the Child Abuse Victim's Rights Act ("CAVRA"), 18 U.S.C. § 2255.

40.  The TVPRA prohibits Defendants from profiting from any venture they know or

11

should know involves a violation of § 1591, and thereby establishes a non-delegable duty of reasonable care.

41.     An overwhelming majority of commercial sex trafficking transactions occur within the hotels and motels, as traffickers use their rooms as the hub for their operations.[20] Hotels offer anonymity and non-traceability, privacy, and discretion, making them ideal venues sex trafficking. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. In addition, traffickers regularly use Defendants' Wi-Fi to advertise and solicit victims for commercial sex against their will.

42.     As part of their conspiracy, to save costs and continually reap millions of dollars in profits, Defendants generally failed to create, adopt, implement, and enforce company-wide policies and procedures regarding suspected incidents of human trafficking at the branded properties—despite the general knowledge in the industry and their own corporate records that human sex trafficking was happening in the hotel industry and in their branded properties. Furthermore, Defendants, did not train staff how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

43.     Upon information and belief, Defendants kept no reports or data on suspected incidences or occurrences of human trafficking on their properties and the rate at which those occurrences changed as a result of implementing human trafficking policies and procedures. Defendants did not establish a mandatory and secure reporting mechanisms at the point of sale.

44.     Despite the proven ability to respond to important societal issues such as COVID-19 by modifying the brand standards to keep guests safe, Defendants did nothing in the face of the

---

[20] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754.

human sex trafficking epidemic in their industry. Instead, they continued to profit from the rental of rooms that they knew or should have known were rented and used for the purpose of sex trafficking.

45. Defendants thus failed to act to ensure that it did not benefit from the human sex trafficking occurring at its branded properties. Defendants failed to implement appropriate policies and procedures that a reasonably diligent corporation would or should have implemented so that it would not continue to benefit from the human trafficking occurring at their branded properties.

46. With little to no risk posed to traffickers seeking to use Defendants' rooms as a location to force victims like M.S. to engage in commercial sex against her will, the sex trade continues to thrive at Defendants' branded properties while Defendants reap the benefits.

47. Plaintiff's injuries are indivisible and cannot be separated. Plaintiff's injuries are the result of continued instances of ongoing violent traumatizing sexual exploitation. A trafficking period is ongoing and continuous and resulting injuries cannot be divided; thereby subjecting the hotel defendants to joint and several liability. Federal common law provides for joint and several liability for indivisible injuries, such as those suffered by Plaintiff.

48. Violators of Section 1595 of the TVPRA are jointly and severally liable for a victim's damages. Victims are entitled to all compensatory and non-compensatory damages incurred during their trafficking period. 18 U.S.C. §1595(a). Thus, Defendants are jointly and severally liable for the Plaintiff's damages in this case.

**THE SEX TRAFFICKING OF PLAINTIFF M.S.**

49. M.S. was kidnapped by her trafficker when she was just fifteen (15) years old.

50. By means of a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, control over identification documents and

13

possessions, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, M.S. was held captive and sold for sex by her trafficker.

51. During the time that she was trafficked, M.S.'s trafficker frequently rented rooms at the Defendants' hotel locations because the rooms provided convenient, anonymous, and relatively central locations for "johns" that would pay to engage in sex with M.S.

52. Throughout her trafficking, M.S.'s trafficker connected with "johns" by posting or causing to be posted advertisements on Backpage, Backpage2, Craigslist, Myredbook, Megapersonals, Kinkyads, Locanto, Kittykatads, Classifieds, and Escortalligator, advertising for M.S.'s availability for commercial sex. M.S.'s trafficker posted many of these advertisements and had conversations with "johns" while connected to Defendants' Wi-Fi.

53. M.S. was forced to have sex with multiple "johns" every day she was trafficked in Defendants' hotels.

54. From approximately October 2012 to May 2013, while under the coercive control of her trafficker, M.S. was imprisoned as a minor in hotel rooms rented by her trafficker and forced her to have sex for money. During that time, M.S. was trafficking in the following hotels:

a. Fresno Rodeway Inn by Choice located at 6730 N Blackstone Ave, Fresno, CA 93710;
b. Super 8 Fresno by Wyndham located at 1087 N Parkway Dr, Fresno, CA 93728;
c. Motel 6 Fresno North Crystal Avenue by G6 located at 1240 N Crystal Ave, Fresno, CA 93728.

55. During the time she was trafficked, M.S.'s trafficker constantly shuffled her back and forth among hotels, often visiting the same hotels repeatedly at intervals.

56. While at the Defendants' hotels, M.S.'s trafficker violently attacked and beat her, and psychologically tormented her by withholding food and water, all to ensure that she could not escape.

14

57. During her captivity at Defendants' hotels, M.S. was raped, continuously abused physically and verbally, malnourished, psychologically tormented, kidnapped, and imprisoned in Defendants' brand hotels listed above.

58. At the above listed hotels, M.S. encountered the same staff on multiple occasions. Defendants' staff would have recognized that M.S. was a child, and seen the signs of her deterioration brought on by the abuse perpetrated by her trafficker, including bruising and physical and verbal abuse occurring in public areas of Defendants' properties as well as signs of malnutrition and poor health.

59. Every time M.S. interacted with Defendants' staff, it was readily apparent that M.S. was under the control of her trafficker. M.S.'s trafficker, who was significantly older than M.S. because she was only a child at fifteen (15) years old, checked in to Defendants' hotels using their own names.

60. M.S.'s trafficker followed a repetitive and routine procedure during stays at the Defendants' hotels and Defendants' hotels knew or should have known of M.S.'s trafficking because of a variety of factors detailed below:

**THE SEX TRAFFICKING OF M.S. AT THE FRESNO RODEWAY INN BY CHOICE**

61. Plaintiff M.S. was subjected to sex trafficking at the Choice branded, Fresno Rodeway Inn located at 6730 N Blackstone Ave, Fresno, CA 93710.

62. M.S. and her trafficker stayed at the Fresno Rodeway Inn by Choice between October 2012 and May 2013, frequently staying here for months at a time. She lived out of the hotel and encountered the same staff on many occasions during this time period.

63. At the Fresno Rodeway Inn, there was constant foot traffic in and out of M.S.'s room. At all hours of the day and the night, the staff witnessed "johns" – who were significantly

older than M.S. – come into the main entrance and to M.S.'s room. The staff also had access to security camera footage documenting the constant stream of buyers from cameras placed in throughout the hotel.

64. M.S.'s trafficker forced her to pick up "johns" right outside of the hotel wearing only lingerie. To make sure that the police were never called, M.S.'s trafficker paid staff at the Fresno Rodeway Inn to keep quiet.

65. On one occasion, M.S. was robbed while waiting for a "john" and her purse was stolen. She ran outside after the perpetrator, passing the Fresno Rodeway Inn front desk staff. M.S. even asked them for security camera recordings of the incident or for the perpetrator's information, but they refused to help her in any way.

66. M.S.'s trafficker was very violent with her at the Fresno Rodeway Inn, and loud sounds of abuse and M.S.'s screams for help could often be heard from the room as she was beaten every day.

67. Further, with each stay at the Fresno Rodeway Inn, it resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Requesting a room away from other guests; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large number of used condoms in the trash; Unusually large number of male visitors asking for M.S. and her trafficker at the front desk; Physical abuse in public spaces; Visible signs of prior and private physical abuse; Unusually large number of male visitors coming in and out of the room; Asking the front desk not to be disturbed; Women wearing clothing inappropriate for the weather; Loud noises of abuse or other emergency audible to staff or other rooms; and Loitering and soliciting on hotel grounds.

68. Plaintiff was repeatedly raped and otherwise sexually abused hundreds of times at

the Fresno Rodeway Inn.

69.    These red flags were open and obvious to anyone working at the Fresno Rodeway Inn.

**THE SEX TRAFFICKING OF M.S. AT THE SUPER 8 FRESNO BY WYNDHAM**

70.    Plaintiff M.S. was subjected to sex trafficking at the Wyndham branded, Super 8 Fresno located at 1087 N Parkway Dr, Fresno, CA 93728.

71.    M.S. and her trafficker stayed at the Super 8 Fresno from October 2012 to May 2013, frequently staying for days at a time, encountering the same staff, within this period.

72.    At the Super 8 Fresno by Wyndham, M.S. remembers staying in a room in the corner, where hotel staff would purposely place M.S. and her trafficker. there was constant foot traffic in and out of M.S.'s room. At all hours of the day and the night, the staff witnessed "johns" – who were significantly older than M.S. – come into the main entrance and to M.S.'s room.

73.    M.S.'s trafficker forced her to pick up "johns" right outside of this hotel as well, wearing only lingerie. M.S.'s trafficker would even pay the Super 8 Fresno hotel staff twice the daily rate.

74.    M.S.'s trafficker was very violent with her at the Super 8 Fresno, and loud sounds of abuse and M.S.'s screams for help could often be heard from the room as she was beaten every day.

75.    Further, with each stay at the Super 8 Fresno, it resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Requesting a room away from other guests; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large number of used condoms in the trash; Unusually large number of male visitors asking for M.S. and her traffickers at the front desk; Physical abuse in public spaces; Visible signs of prior and

17

private physical abuse; Unusually large number of male visitors coming in and out of the room; Asking the front desk not to be disturbed; Women wearing clothing inappropriate for the weather; Loud noises of abuse or other emergency audible to staff or other rooms; and Loitering and soliciting on hotel grounds.

76.    Plaintiff was repeatedly raped and otherwise sexually abused thousands and thousands of times at the Super 8 Fresno by Wyndham.

77.    These red flags were open and obvious to anyone working at the Super 8 Fresno by Wyndham.

**THE SEX TRAFFICKING OF M.S. AT THE MOTEL 6 FRESNO BY G6**

78.    Plaintiff M.S. was subjected to sex trafficking at the G6 branded, Motel 6 Fresno North Crystal Avenue located at 1240 N Crystal Ave, Fresno, CA 93728.

79.    M.S. and her trafficker stayed at the Motel 6 Fresno from October 2012 to May 2013, frequently staying for days at a time, encountering the same staff, within this period.

80.    At the Motel 6 Fresno by G6, M.S. remembers staff purposely placing her and her trafficker in the corner room of this hotel as well. In fact, Motel 6 Fresno hotel staff was told specifically not to go to their room.

81.    There was constant foot traffic in and out of M.S.'s room. At all hours of the day and the night, the staff witnessed "johns" – who were significantly older than M.S. – come into the main entrance and to M.S.'s room.

82.    Along with other girls, M.S. was forced by her trafficker to pick up "johns" right outside of this hotel as well, wearing only lingerie. M.S.'s trafficker would pay Motel 6 Fresno hotel staff twice the daily rate.

83.    M.S.'s trafficker was very violent with her at the Motel 6 Fresno, and loud sounds

of abuse and M.S.'s screams for help could often be heard from the room as she was beaten every day. M.S. was not allowed to eat or sleep until she made money.

84. Further, with each stay at the Motel 6 Fresno by G6, it resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Requesting a room away from other guests; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large number of used condoms in the trash; Unusually large number of male visitors asking for M.S. and her traffickers at the front desk; Physical abuse in public spaces; Visible signs of prior and private physical abuse; Unusually large number of male visitors coming in and out of the room; Asking the front desk not to be disturbed; Women wearing clothing inappropriate for the weather; Loud noises of abuse or other emergency audible to staff or other rooms; and Loitering and soliciting on hotel grounds.

85. Plaintiff was repeatedly raped and otherwise sexually abused thousands and thousands of times at the Motel 6 Fresno by G6.

86. These red flags were open and obvious to anyone working at the Motel 6 Fresno by G6.

## DEFENDANTS' KNOWLEDGE OF SEX TRAFFICKING AT THEIR LOCATIONS

87. Defendants are aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[21] The United Nations,[22] international non-

---

[21] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[22] *Global Report on Trafficking in Persons*, UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html

profits,[23] and the U.S. Department of Homeland Security,[24] have documented this well-known epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. Defendants cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds their industry.

88.     For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

89.     Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[25] and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[26] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the

---

[23] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[24] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

[25] *The Blue Heart Campaign,* UNITED NATIONS (2022), https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heinous%20crime.

[26] *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

90. The Defendants, on information and belief, have access to individual hotel location do-not-rent lists that often list reasons for the refusal to rent, including the suspicion of human trafficking. The Defendants nevertheless do not share such information with other hotel locations, thereby preventing other of their hotel locations from acting to protect the victims of such suspected human traffickers.

91. The Defendants also have access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

92. The Defendants have access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

93. A brief examination of just a handful of examples for each Defendant suffices to show the extraordinary frequency with which the Defendants have long received and continue receiving evidence and reports that human trafficking runs rampant at their hotel locations:

**CHOICE**

94. Countless tales of tragedy, which upon information and belief Choice knows about, establish the entrenched and pervasive nature of Choice's role in providing a venue where sex trafficking has continued, unabated, for years. For example, reviews, news articles, and notable press of illegal activities of its branded properties, which upon information and belief Choice monitors regularly, also show the pervasiveness of sex trafficking at its branded properties and

Choice's knowledge of the same.

    a. Regarding a stay in July 2013 at the Fresno Rodeway Inn, a customer wrote a review saying, "Prostitutes roaming around. Not good for families. The location is close to the Interstate but the area is BAD! Prostitutes roaming around in the parking lot and loby."

    b. Regarding a stay in 2012 at Rodeway Inn Oceana, a customer wrote: Anyone booking a room online, I'm sure, is not searching for a room that is used for prostitution and crack use! Oh yes, ladies and gentlemen, in the night stand, where you would normally find a bible, we found a wallet containing various condoms and customer telephone numbers along with a crack pipe wrapped in a hand towel. The room felt very sketchy and the appearance didn't help. Do yourself a favor and STAY far, far away!!! Don't believe me? Take a look, I uploaded a photo!"[27]

    c. Regarding a stay in 2013 at Rodeway Inn Near Coachella, a customer wrote: By far the WORST Motel ever!! We had Hookers knocking on our doors/windows ALL night long. And on more than one night. Had we not prepaid for entire stay, we would have left!! When we told the owners, they laughed!! Are you kidding me?? Place sucks, maid stole from us. TV remote didn't work. Towels are cheesy. Had to ask for toilet paper. Horrible horrible horrible place!! I will be reporting these owners!![28]

    d. Regarding a 2013 WISN 12 News Article: A woman was held at the Rodeway Inn on South 27th Street against her will as her captors advertised her like a commodity online and then forced her to have sex with the men who responded to the ads.[29]

    e. Regarding a 2010 CBS News Article: An Atlanta Woman Caged like a Dog, Beaten, Locked Up for Trying to Escape Prostitution at Rodeway Inn off of

---

[27]https://www.tripadvisor.com/LocationPhotoDirectLink-g29750-d2423105-i42146309-Rodeway_Inn_Oceanview-Atlantic_City_New_Jersey.html

[28] https://www.tripadvisor.com/ShowUserReviews-g32524-d2037946-r153334691-Rodeway_Inn_Near_Coachella-Indio_Greater_Palm_Springs_California.html

[29] https://www.wisn.com/article/racine-woman-says-she-was-forced-held-captive-forced-into-prostitution/6316287

Fulton Industrial Boulevard in southwest Atlanta.[30]

95.     This sampling of news stories, reviews, and other public information establishes that, at the time M.S. was trafficked at the Fresno Rodeway Inn, Choice knew or should have known that:

    a.  There was widespread and ongoing sex trafficking occurring at Choice Branded properties.

    b.  Sex trafficking was a brand-wide problem for Choice originating from management level decisions at their corporate offices.

    c.  Choice branded properties and hotel staff were not taking reasonable steps to identify and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties.

    d.  Choice and its branded properties were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

96.     Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, Choice continued to earn revenue by continuing conduct that they knew or should have known was in violation of the statute.

## WYNDHAM

97.     Countless tales of tragedy, which upon information and belief Wyndham knows about, establish the entrenched and pervasive nature of Wyndham's role in providing a venue where sex trafficking has continued, unabated, for years. For example, reviews, news articles, and notable press of illegal activities of its branded properties, which upon information and belief Wyndham monitors regularly, also show the pervasiveness of sex trafficking at its branded properties and Wyndham's knowledge of the same.

    a.  Regarding a stay in November 2013 at the Indianapolis Days Inn by Wyndham, a hotel customer wrote a review saying, "The entire hotel smelled horrible. The

---

[30]https://www.cbsnews.com/news/atlanta-woman-caged-like-dog-beaten-locked-up-for-trying-to-escape-prostitution-say-cops/

carpets were not cleaned. I felt like I was on prostitute avenue. Traffic coming and going from the hotel all hours of the night. Constant noises coming from the rooms. I came back to the hotel late one night, young hoodlums hanging out around private entrances to hotel. No security, no lighting, as a single woman traveling alone, I did not feel safe coming and going from hotel."

b. Gang Members and Hotel Owners Indicted in Sex Trafficking, Prostitution Conspiracy: The indictment alleges that Hitesh Patel, 27, and his 60-year-old father, Vinod Patel, acting on behalf of Gayatri Investments, LLC, facilitated and allowed members and associates of the enterprise to rent rooms at the Oceanside Travelodge, using other people's identification, knowing of the illegal activity that would occur, and, occasionally, understanding that payment would be made following "dates" or "tricks.[31]

c. Tallahassee Man Sentenced to Life for Child Sex Trafficking at Super 8 Motel located at 2228 Phillips Highway.[32]

d. Alleged Victims Testify in Teen Prostitution and Human Trafficking Case at Super 8 Motel at 28th Street SE near Patterson Avenue.[33]

98.    This sampling of news stories, reviews, and other public information establishes that, at the time M.S. was trafficked at the Super 8 Fresno, Wyndham knew or should have known that:

a. There was widespread and ongoing sex trafficking occurring at Wyndham Branded properties.

b. Sex trafficking was a brand-wide problem for Wyndham originating from management level decisions at their corporate offices.

c. Wyndham branded properties and hotel staff were not taking reasonable steps to identify and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties.

d. Wyndham and its branded properties were earning revenue by providing venues

---

[31]https://www.cbs8.com/article/news/gang-members-and-hotel-owners-indicted-in-sex-trafficking-prostitution-conspiracy/509-d4700722-d6e2-4648-bb02-555f884345bd

[32] https://archives.fbi.gov/archives/jacksonville/press-releases/2011/ja011011.htm

[33] https://www.mlive.com/news/grand-rapids/2012/02/alleged_victims_testify_in_tee.html

24

where widespread and ongoing sex trafficking was occurring.

99. Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, Wyndham continued to earn revenue by continuing conduct that they knew or should have known was in violation of the statute.

## G6

100. Countless tales of tragedy, which upon information and belief G6 knows about, establish the entrenched and pervasive nature of G6's role in providing a venue where sex trafficking has continued, unabated, for years. For example, reviews, news articles, and notable press of illegal activities of its branded properties, which upon information and belief G6 monitors regularly, also show the pervasiveness of sex trafficking at its branded properties and G6's knowledge of the same.

    a. Regarding a stay in 2009 at Motel 6 Fresno, a customer wrote: "Attention families, or anyone else for that matter, DO NOTTTT STAY AT THIS HOTEL!!!!!!!. I was in town for my younger brother's soccer tournament. First of all, the keys never worked so we had to get the door open by the on duty runner. Second, there were prostitutes (at least 3) that were walking around the hotel and had rooms near us. 2 of them even asked me if I wanted service despite the fact that I was walking around with a baby. The front desk didn't seem to care because apparently it was something normal. The rooms all stinked like smoke. I changed the first time but after that it was a matter of which one stinked the least. In other rooms it was pretty obvious that people were smoking Marijuana, I reported it but again no one seemed to think it was odd. At night we locked the door and put a chair in front of it and hoped for the best. Overall I know that paying $45 wont get me much but honestly, it was the worst hotel that I have ever stayed at. As soon as the sun was up in the morning, we packed our bags and left. I recommend that you stay at the days inn accross the street or any of the other hotels a block away. Unless you want to be hassled by prostitutes and smell smoke 24/7 dont

stay here."[34]

    b. Regarding a 2011 ABC30 News Article: "The area near this Motel 6 on Blackstone and Griffith is a favorite hangout for prostitutes. Teresa Excinia said, "No matter what time of day it is you see a lot of working girls walking back and forth, across the street, right here in front."[35]

    c. Regarding a 2013 KSAT News Article: Sex Trafficking Ring Busted at Motel 6 – 2 girls, both 15, made sex assault, prostitution outcries to investigators.[36]

    d. Motel 6 Prostitution Sting Leads to Eight Arrests at the Motel 6 at 5601 Mowry Ave.[37]

    e. Prostitution Ring: Man Arrested In Hotel, Found With 15 Year Old inside of a Merced-area Motel 6. Police later found two other females, including an underage girl, who they say are connected to the prostitution ring.[38]

101. This sampling of news stories, reviews, and other public information establishes that, at the time M.S. was trafficked at the Motel 6 Fresno, G6 knew or should have known that:

    a. There was widespread and ongoing sex trafficking occurring at G6 Branded properties.

    b. Sex trafficking was a brand-wide problem for G6 originating from management level decisions at their corporate offices.

    c. G6 branded properties and hotel staff were not taking reasonable steps to identify and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties.

    d. G6 and its branded properties were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

102. Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, G6 continued to earn revenue by continuing conduct that they knew or should have known was in violation of the statute.

---

[34] https://www.yelp.com/biz/rodeway-inn-fresno-3?start=20
[35] https://abc30.com/archive/8107870/
[36] https://www.ksat.com/news/2013/09/17/sex-trafficking-ring-busted-at-motel-6/
[37] https://patch.com/california/newark/prostitution-sting-at-motel-6-leads-to-eight-arrests
[38] https://kmph.com/archive/prostitution-ring-man-arrested-in-hotel-found-with-15-year-old

## DEFENDANTS FACILITATED THE TRAFFICKING OF M.S.

103. Each Defendant is a signatory of the Code[39] and thereby has promised to adopt these policies to combat trafficking. Yet, Defendants have failed to implement most, if not all these policies, and continue to unlawfully benefit from the trafficking on their properties.

104. Defendant Choice is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Choice publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Choice should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

105. Defendant Wyndham is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Wyndham publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Wyndham should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

106. Defendant G6 is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Wyndham publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Wyndham should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

107. Defendants profited from the sex trafficking of Plaintiff M.S. Defendants rented rooms to and provided Wi-Fi to M.S.'s traffickers when they knew, or should have known, that human trafficking was prevalent within their branded properties and at the specific locations where

---

[39] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

M.S. was trafficked. The hotel staff, especially front desk staff, at Defendants properties knew or should have known of the obvious signs of M.S.'s trafficking.

108.     Defendants benefited from the steady stream of income that M.S.'s traffickers and "johns" bring to their hotel brands. Defendants profited from each and every room that M.S.'s traffickers and customers rented where M.S. was harbored and maintained for the purpose of sex trafficking. In addition, Defendants profited from data collected each and every time M.S.'s traffickers and customers used Defendants' Wi-Fi to advertise and solicit M.S. for commercial sex.

109.     Defendants have made a public commitment to combat human trafficking, and thus, are aware that trafficking is a common problem in the hospitality industry. Defendants should have been aware of the benefits they were receiving from the human trafficking occurring at the locations where M.S. was trafficked given Defendants access to information, such as police reports, news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

110.     Moreover, Defendants repeatedly collected data on M.S., her traffickers, and her "johns" from her many stays at Defendants hotels, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data. Defendant's employees witnessed the obvious signs of M.S.'s trafficking including signs of abuse, frequent male visitors coming in and out of the room, condoms in the trash, loud yelling and fighting, and others. Despite having access to all this information for years, Defendants failed to take reasonable measures to stop benefitting from sex trafficking occurring in their hotels. If Defendants would have taken proper measures, Defendants would not have profited from M.S. and other victims like her being trafficked at their locations.

111.     Upon information and belief, Defendants discussed, developed, and implemented uniform policies and procedures to identify, and mitigate the risk of human trafficking occurring at their properties, including the hotels where M.S. was trafficked. These policies included ongoing communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual conferences, alerts to hotels in high-risk areas or in proximity to high-risk events, and field-based associates who visit hotels specifically to discuss human and sex trafficking issues.

112.     Pursuant to these policies, branded location employees and property management regularly reported customer data and other indicators of trafficking including suspicious criminal activity, web data indicating use of commercial sex websites, and data associated with reservations. The staff at the properties where M.S. was trafficked and reported this to Defendants or would have if Defendants did not fail to institute reasonable policies and procedures.

113.     In addition, Defendants had access to much of this data through the management of centralized data systems it required the branded properties to use, including but not limited to the property management, booking, credit processing, and information technology and internet systems.

114.     Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to stop reaping the benefits of sexual exploitation on their properties. Defendants maintained their deficiencies to maximize profits by:

   a. Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

   b. Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

c. Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

d. Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

e. Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

f. Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

g. Failing to use its power as a parent company hold the franchisees accountable for contributing to the prevalence of sex trafficking on their properties.

115. As a direct and proximate result of these egregious practices on the part of the Defendants, M.S. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

**DEFENDANTS' CONTROL OVER THEIR BRAND HOTELS**

116. Upon information and belief, it is a standard practice in the hospitality industry, followed by Defendants, for Parent Hotel Corporations to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that shall be placed on each bed, to the types of funds accepted, to when, where and how guests should be greeted.

117. Defendants provide their branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the parent hotel brand. The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

30

118.     Defendants provide their branded properties branded name recognition, a marketing campaign, and hotel listings in the Global Distribution System and other online travel agency databases, as well as hotel locations with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites.  Thus, booking and room reservations are to a large extent controlled by the Hotel Defendants.  Defendants see booking and reservation trends, including for those branded hotels where Plaintiff was trafficked.[40]

119.     Upon information and belief, Defendants require its branded hotel properties to use a property management system, which is linked to Defendants' corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions.

120.     Upon information and belief, per the relevant franchise agreements,[41] Defendants may enforce their brand standards by means of periodic inspections of their brand hotel locations, backed up with the ultimate threat of termination of the franchise agreement.

121.     Upon information and belief, per the relevant franchise agreements, the Hotel Defendants may enforce their brand standards by means of periodic inspections of hotel locations, backed up with the ultimate threat of termination of the franchise agreement.

122.     Upon information and belief, the Hotel Defendants' brand standards are so strict as to bar entirely certain efforts to combat trafficking, for instance by prohibiting the prominent placement of informational signs within hotel rooms offering to help victims escape.

123.     It is further a standard practice in the hospitality industry, upon information and

---

[40] Where a branded hotel allows cash to be accepted for payment, monitoring and auditing these trends are important to identifying locations where criminal activity and commercial sex trafficking may be occurring.
[41] Most franchise disclosure documents, which outline the policies and procedures of franchise agreements, can be accessed publicly for free by making an account on https://fddexchange.com/view-fdd-docs.

31

belief, followed by all Hotel Defendants, for parent companies to exercise significant control over the employment decisions of their hotel locations.

124. The Hotel Defendants and their hotel locations exhibit a significant degree of interrelated, intermingled, and unified operations at the locations at which Plaintiff was trafficked. Upon information and belief, the Hotel Defendants promulgate policies, procedures, and standards governing the hiring, training, retention, and advancement of on-the-ground employees and setting their rates of pay, which together exert significant control over all employment decisions made at the individual hotel locations at which Plaintiff was trafficked.

125. On information and belief, the Hotel Defendants utilize some of these funds to monitor the brand standards and to offer training to hotel operators and franchisees.

126. Under federal labor regulations, the Hotel Defendants are each considered joint employers of the employees at their locations at which Plaintiff was trafficked.

127. As seen by citations herein to Defendants' websites, each shares or co-determine those matters governing the essential terms and conditions of employment each Defendant sets the essential terms and conditions of employment, including hiring, training, retention, advancement, and setting rates of pay.

128. Specifically, the Hotel Defendants create and promulgate policies relating to training employees to recognize and respond to human trafficking, and the Hotel Defendants determine whether such training shall be mandatory.

129. Despite their knowledge that few, if any, employees at their hotel locations actually receive trainings if the same are not mandated, the Hotel Defendants have failed to mandate such training on any significant scale or at the specific locations where Plaintiff was trafficked.

130. On information and belief, the Hotel Defendants require their hotel locations to

32

pay approximately 10% of gross revenue back to the Hotel Defendants for the privilege of using the Hotel Defendants' names and following their brand standards.

131. The stringent control and standardization of operations across Defendants' branded properties, including mandatory use of specific reservation and payment systems, not only streamline corporate oversight but also optimize revenue streams. These systems, while ostensibly for operational efficiency, also inadvertently facilitated the booking processes used by traffickers, thereby increasing room occupancy rates and directly benefiting Defendants financially.

**CHOICE**

132. Choice exercised day-to-day control over the Fresno Rodeway Inn and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Choice implements and retains brand hotel control over, including control over the Fresno Rodeway Inn where M.S. was trafficked, as either direct subsidiaries or under the terms of its franchise agreements.

133. Upon information and belief, Choice controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

   a. Requiring the branded locations to use Choice's property management system;
   b. Gathering reports of data generated by branded locations including reservation, payment, and occupancy information through Choice's centralized systems;
   c. Requiring branded locations to keep audit reports and other records;
   d. Conducting regular inspections for compliance with franchise agreement terms and Choice's rules and regulations;
   e. Providing marketing requirements and standardized marketing services for the branded locations;

33

f.   Regulating the all the policies, procedures, and standards of the branded properties from the front desks to the bathrooms;

g.   Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

h.   Requiring branded locations to install Choice's data transport system to share data with Choice corporate;

i.   Providing training and orientation materials for branded property staff;

j.   Requiring branded locations to make modifications to the branded properties upon Choice's request and to refrain from make substantial changes to the branded property without Choice's permission;

k.   Regulating the rates for room rentals; and

l.   Insurance coverage requirements.[42]

134.    Choice manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Choice.[43]

135.    Choice controls uniform and required reservation, marketing, customer support systems and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on Choice's website, and mentions across its corporate media channels.[44]

136.    Choice mandates usage of a cloud-based centralized property management system called ChoiceADVANTAGE to its branded locations.[45]

137.    Choice controls all hotel reservations made across its branded locations on its

---

[42] See e.g. Comfort Inn 2020 Franchise Disclosure Document, https://fddexchange.com/view-fdd-docs/comfort-inn-2020-fdd-franchise-information-costs-and-fees/

[43] *See* e.g. *Why Choice?,* CHOICE, https://choicehotelsdevelopment.com/why-choice (last visited Jun. 9, 2022). id. ("We've taken our teams' collective knowledge of hotel operations, technology, service and leadership, and developed the tools and resources our owners use every day to help run their businesses.").

[44] *Id.*

[45] *Connect the world through the power of hospitality*, CHOICE, https://www.choicehotels.com/about

centralized reservation system called Choice Edge.[46]

138. Through its national sales team, Choice controls the credit processing system and the centralized direct billing at its brand hotels, including the Fresno Rodeway Inn.[47]

139. Choice gathers data from its customers including names, payment information, reservation history, browsing data, other details associated with their stay for promotional and guest safety reasons.[48]

140. Upon information and belief, Choice requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place which gives Choice the ability to access, monitor, and harvest that internet data.

141. Under the guise of maintaining its "brand standards," Choice also forces its branded hotels to frequently undertake expensive renovations, remodeling, and construction efforts, as well as purchase mandated products with limited warranties which are shortened by such onerous and exorbitant requirements.[49]

142. Choice requires branded properties to comply with its corporate policies relating to Security and Guest Safety, Human Rights, Ethics, Corporate Governance, and compliance with the law.[50]

**WYNDHAM**

143. Wyndham exercised day-to-day control over Super 8 Fresno and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Wyndham

---

[46] *Supra* n 101

[47] *Id.*

[48] Choice Hotels International, Inc. *Privacy & Security Policy,* https://www.choicehotels.com/legal/privacy-policy

[49] *See e.g.*, *Convert an Existing Hotel*, CHOICE HOTELS, https://choicehotelsdevelopment.com/ convert-a-hotel/#upscale (last visited Jun. 9, 2022).

[50] Choice claims to "strive to conduct [its] business operations free from violations of human rights" *See Human Rights Policy*, CHOICE HOTELS, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited Jun. 6, 2022).

implements and retains brand hotel control over, including control over the Super 8 Fresno where M.S. was trafficked, as either direct subsidiaries or under the terms of its franchise agreements.

144. Upon information and belief, Wyndham controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

a. Requiring the branded locations to use Wyndham's property management system;

b. Requiring branded locations to keep audit reports and other records;

c. Conducting regular inspections, quality assurance evaluation reports, and audits for compliance with franchise agreement terms and Wyndham's corporate policies;

d. Gathering reports of data generated by branded locations including reservation, payment, and occupancy information through Wyndham's centralized systems;

e. Requiring the brands to regularly report data regarding customer feedback to Wyndham;

f. Providing marketing requirements and standardized marketing services for the branded locations;

g. Regulating the all the policies, procedures, and standards of the branded properties from the front desks to the bathrooms;

h. Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access, security, filtering;

i. Providing training and orientation materials for branded property staff;

j. Requiring branded locations to make modifications to the branded properties upon Wyndham's request and to refrain from make substantial changes to the branded property without Wyndham's permission;

k. Requiring branded properties to comply with Wyndham's Human Rights Policy and other laws;

l. Regulating the rates for room rentals; and

m.  Insurance coverage requirements.[51]

145.     Wyndham manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Wyndham.[52]

146.     Wyndham controls uniform and required reservation, marketing, customer support systems and royalty programs at its branded hotels through national press releases, newsletters, emails, announcements on Wyndham's website, and mentions across its corporate media channels.[53]

147.     Through its national sales team, Wyndham controls the credit processing system and the centralized direct billing at its brand hotels, including the Super 8 Fresno.[54]

148.     Wyndham mandates branded properties source through Wyndham's global distribution system.[55] Wyndham mandates the use of specific vendors and suppliers for the purchase of goods and services at its brand hotels, including the Super 8 Fresno.[56]

149.     Wyndham regulates property rate, inventory availability, and overall revenue management for the branded locations by monitoring hotel booking data for trends and patterns.[57]

---

[51] *See e.g.* 2014 Franchise Disclosure Document https://fddexchange.com/wp-content/uploads/2014/03/Days-Inn-Franchise-Disclosure-Document-FDD-July-12-2012.pdf

[52] *Our Brands*, WYNDHAM HOTELS, https://www.wyndhamhotels.com/wyndham-rewards/our-brands (last visited Jun. 15 2022).

[53] *Benefits of Partnering with Wyndham Hotels & Resorts,* WYNDHAM HOTELS, CHOICE, https://development.wyndhamhotels.com/the-wyndham-advantage/ (last visited Jun. 15, 2022).

[54] *Id.*

[55] *Benefits of Partnering with Wyndham,* WYNDHAM, https://development.wyndhamhotels.com/the-wyndham-advantage/ (last visited Jun. 20, 2022).

[56] *See e.g., id* ("[Our goal is to ensure the design and construction of your hotel is as seamless as possible, guided by the appropriate brand standards.")

[57] Id.

150.     Wyndham manages its branded properties through its Oracle Hospitality OPERA Cloud Property Management System.[58] Wyndham's Development and Sourcing teams negotiate contracts on behalf of brands for hotel infrastructure, operating supplies and equipment and food and beverage.[59]

151.     Wyndham sets and controls Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including the Super 8 Fresno.[60]

152.     Wyndham is the employer of the staff at its branded properties. For example, Wyndham posts all hotel jobs on its parent website.[61] Wyndham is also responsible for setting the core values and culture for all Wyndham employees.[62] In addition, Wyndham sets forth policies for, and provides employee benefits.[63]

153.     Wyndham first adopted a Human Rights Statement in 2007. According to the updated 2018 policy, Wyndham promises to comply with human rights laws and standards and has "accountability mechanisms" in place to monitor and report on compliance. Brand locations are required to comply with human rights and "operating standards." Failure to comply can result

---

[58] *Wyndham Implements Oracle Hospitality OPERA Cloud Property Management in its Full-Service Hotels,* HOTEL TECHNOLOGY NEWS (May 18, 2021), https://hoteltechnologynews.com/2021/05/wyndham-implements-oracle-hospitality-opera-cloud-property-management-in-its-full-service-hotels/

[59] *Supra* n 103

[60] *Leveraging technology to deliver an exceptional guest experience,* WYNDHAM (Summer 2021) 4, https://developmentsupport.wyndham.com/files/8516/2869/4484/Tech-Guide-Q3-2021.pdf

[61] *Join the Wyndham Family,* WYNDHAM, https://careers.wyndhamhotels.com/ (last visited Jun. 22, 2022)

[62] *About Wyndham,* WYNDHAM, https://careers.wyndhamhotels.com/content/About-Wyndham/#culture (last visited Jun 22, 2022)

[63] *Our Benefits,* WYNDHAM, https://careers.wyndhamhotels.com/content/Our-Benefits/?locale=en_US (last visited Jun 22, 2022)

in the termination of the franchise agreement.[64]

## G6

136.    G6 exercised day-to-day control over the Motel 6 and its other brand hotels through centralized corporate systems, training, policies, and brand standards. G6 implements and retains brand hotel control over, including control over the Motel 6 Fresno where M.S. was trafficked, as either direct subsidiaries or under the terms of its franchise agreements.

137.    Upon information and belief, G6 controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

    a  Requiring the branded locations to use G6's centralized property management, data management, and reservation and billing systems;

    b.  Gathering reports of data generated by branded locations including guest information, reservation, payment, and occupancy information through G6's centralized systems;

    c.  Conducting regular quality assurance inspections and audits for compliance with franchise agreement terms and G6's rules and regulations;

    d.  Requiring brands to purchase products through G6's e-procurement marketplace system or from approved suppliers;

    e.  Requiring branded properties to pay fees based of the percentage of gross room revenues;

    f.  Providing advertising requirements and standardized marketing services for the branded locations;

    g.  Requiring branded hotels to use approved vendors for internet services or other requirements for cybersecurity and technology;

---

[64] *Human Rights Statement*, http://q4live.s22.clientfiles.s3-website-us-east-1.amazonaws.com/153757806/files/doc_downloads/governance_documents/Wyndham-Hotel-Resorts-Human-Rights-Policy-Statement.pdf (last visited Jun. 15, 2022).

h. Requiring all fixtures, furnishings, equipment, signs, services, materials, and supplies to meet G6's strict standards and specifications;

i. Regulating employment policies at branded location including training and orientation materials for staff;

j. Requiring branded locations to make modifications to the branded properties upon G6's request and to refrain from make substantial changes to the branded property without G6's permission;

k. Regulating the rates for room rentals; and

l. Insurance coverage requirements.[65]

138. G6 jointly employed all staff located Motel 6 Fresno where M.S. was trafficked.

139. G6 manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by G6.

140. G6 controls uniform and required reservation, marketing, customer support systems and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on G6's website, and mentions across its corporate media channels.[66]

141. G6 requires branded properties to use a centralized, cloud-based reservation and property management system.[67]

---

[65] *See e.g.* 2017 Motel 6 Franchise Disclosure Document, https://fddexchange.com/view-fdd-docs/motel-6-2017fdd-summary/motel-6-2017-fdd/

[66] G6 offers a centralized reservations system on its website, a customer support channel, and press releases and announcements about the Motel 6 brand through g6hospitality.com; G6 also offers a reward program specific to the Motel 6 brand. *See Join My6,* MOTEL 6, https://www.motel6.com/en/home/my6/join.html

[67] *See* Michal Christine Escobar, *2020 Enterprise Innovator: Motel 6,* HOSPITALITY TECHNOLOGY, https://hospitalitytech.com/2020-enterprise-innovator-motel-6

142. G6 gathers data from its customers including names, payment information, reservation history, browsing data, other details associated with their stay for promotional and guest safety reasons.[68]

143. G6 requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place which gives G6 the ability to access, monitor, and harvest that internet data.[69]

144. G6 requires branded properties to comply with its corporate policies relating to Safety and Security, Codes of Conduct, Ethics, Economic, Social, Governance, and compliance with the law.[70]

## CAUSES OF ACTION

### COUNT 1: 18 U.S.C. § 1595 ("TVPRA")
### (AGAINST ALL DEFENDANTS)

145. Plaintiff incorporates each foregoing allegation.

146. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

147. Defendants are liable as perpetrators within the meaning of 18 U.S.C. § 1595(a) because in the ways described above, each Defendant knowingly or recklessly participated in harboring, maintenance, and/or other acts in further of sex trafficking, including the sex trafficking of M.S. and each Defendants knowingly benefitted, by receiving financial and other compensation, through their participation in a venture that they knew or were reckless in not knowing involved the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits. 18 U.S.C. §§ 1590(a), 1591(a)(2), 1593A.

---

[68] G6 Hospitality. *Privacy Policy,* https://www.motel6.com/en/home/policies/privacy-policy.html
[69] Motel 6, *Web and Mobile Ethical Vulnerability Disclosure Policy,*
https://www.motel6.com/en/home/policies/vulnerability-disclosure.html
[70] *Combatting Human Trafficking,* G6 HOSPITALITY, https://g6hospitality.com/about-us/combating-human-

148.    Furthermore, Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Defendants breached this duty by facilitating violations of the TVPRA through their participation in the harboring, maintaining, soliciting, and advertising of Plaintiff and her traffickers for the purposes of commercial sex induced by force, fraud, or coercion.

149.    Defendants have continued to benefit as a result of these acts, omissions, and/or commissions by renting rooms and providing Wi-Fi to traffickers and customers, keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion, they received payment for rooms or kickbacks from internet usage, contributing to their direct financial benefit from the sex trafficking of Plaintiff when they knew or should have known that violations of §1591(a) were occurring.

150.    Despite knowledge of M.S.s sex trafficking by Defendants, M.S.'s traffickers were able to continue renting rooms for the sexual exploitation of M.S.

151.    Each Defendant participated in a venture together and with, among others, M.S.'s traffickers. Defendants had an ongoing business relationship and association in fact with M.S.'s traffickers. Despite knowing or having reason to know that M.S. was being sex trafficked in violation of the TVPRA, Defendants continued to rent rooms to her traffickers, providing a secure venue for M.S.'s sexual exploitation. M.S.'s sex traffickers used Defendant's Hotels because they knew that staff members looked the other way despite obvious signs of trafficking. Each of the venturers shared a common purpose – the rental of hotel rooms and the making of profits. Each

Defendant profited while M.S.'s trafficker was able to rent a secure venue to earn profits by trafficking M.S. Each Defendant participated in the venture by continually renting rooms to M.S.'s trafficker, failing to properly implement anti-trafficking rules and policies, and assisting traffickers to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of M.S.'s trafficking.

152.    Each Defendant's failure to train and supervise their agents and employees, as well as their disregard for the welfare of their guests, including M.S., enabled and contributed to her sex trafficking.

153.    The facts alleged establish that each Defendant knowingly benefitted, financially or by receiving anything of value, from participating in a venture that Defendants knew or should have known has engaged in an act in violation of the TVPRA.

154.    M.S. further alleges that, as a result of the relationship between Defendants and their branded properties, Defendants are vicariously liable for the acts of their branded properties, including at the subject property. Defendants and their branded properties jointly controlled the terms and conditions of employment for staff, making them joint employers. Factors that support this allegation include shared profits, standardized employee training, strict rules of operation, control over pricing and reservations, regular inspections, operational support, and Defendants' right to terminate franchise agreements with their branded properties, including the subject property, for failing to comply with these requirements. Therefore, Defendants retained control, or the right to control, the mode and manner of work contracted for, making them responsible for the acts and omissions of staff and branded properties.

155.    Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendants' hotels and properties. The actions,

omissions, and/or commissions alleged in this pleading were the "but for'" and proximate cause of Plaintiff's injuries and damages, therefore Defendants are jointly and severally liable.

## COUNT 2: 18 U.S.C. § 2255(A) CHILD ABUSE VICTIMS RIGHTS ACT ("CAVRA") (AGAINST ALL DEFENDANTS)

156. Plaintiff incorporates each forgoing allegation.

157. Plaintiff was a "minor" pursuant to 18 U.S.C. § 2255(a) when she was trafficked.

158. Plaintiff was the "victim" of violations of 18 U.S.C. §§ 1589, 1590, and 1591.

159. Plaintiff suffered "personal injury" pursuant to 18 U.S.C. § 2255(a) as a result of those violations.

160. Plaintiff was a "person" who "has not attained the age of 18 years" pursuant to 18 U.S.C. § 1591(a)(2).

161. Pursuant to 18 U.S.C. § 2255(a), Plaintiff M.S. is entitled to a civil remedy for minors who are victims of violations of Chapter 110 of Title 18, including sexual exploitation and trafficking.

162. Defendants knew or should have known that means of force, threats of force, fraud, coercion, or any combination of those means would be used to cause Plaintiff to engage in a commercial sex act, pursuant to 18 U.S.C. § 1591(a)(2). As a minor, there is a legal presumption that any commercial sex act involving M.S. was induced by force, fraud, or coercion, as minors cannot legally consent to such acts.

163. Defendants knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff, pursuant to 18 U.S.C. 1591(a)(1), by providing her and her traffickers rooms in hotels and Wi-Fi used advertise Plaintiff and solicit customers affecting interstate commerce where authorities were unlikely to discover the injuries being sustained by Plaintiff.

164. Defendants knowingly benefited, financially or by receiving anything of value, from participation in ventures of renting rooms and providing Wi-Fi that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff to engage in commercial sex acts.

165. Wherefore, by reason of the foregoing, Defendants are jointly and severally liable to Plaintiff for compensatory damages and for punitive damages, in the amount to be determined at trial, together with interest and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a. Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b. Disgorgement of profits obtained through unjust enrichment;

c. Restitution;

d. Statutory and/or treble damages, where available;

e. Punitive damages;

f. Attorneys' fees and expenses;

g. The costs of this action;

h. Pre- and post-judgment interest; and

i. Any other relief the Court or jury deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by struck jury.

Dated: October 3, 2024

Respectfully submitted,

*/s/ Penny L. Barrick*
Penny L. Barrick (0074110)
Steven C. Babin, Jr. (0093584)
**Babin Law, LLC**
10 West Broad Street, Suite 900
Columbus, Ohio 43215
T: 614-761-8800
E: penny.barrick@babinlaws.com
steven.babin@babinlaws.com /